## R. E. COLLINS v. STATE.

No. A-3750.   Opinion Filed May 3, 1922.
Rehearing Denied Dec. 2, 1922.
(210 Pac. 285.)

(Syllabus.)

1. Homicide—Instructions—Definitions of Murder and Manslaughter. The instructions relating to murder and included offenses given and refused analyzed and found sufficient.

2. Homicide—Jury Question as to Whether Cane, Was a Deadly Weapon. As a matter of law, a walking cane is not per se a deadly weapon. In this case it was a question of fact for the jury.

3. New Trial— Qualifications of Jury—Refusal of New Trial for Juror's Vague Statements as to Opinion. There was no error in the court's refusal to grant a new trial on the showing made by affidavits to impeach the qualifications of two certain jurors to the effect that about a year previous to the trial these two jurors made indefinite statements indicating that they may have had an opinion that the defendant was at fault.

Appeal from District Court, Seminole County; J. W. Bolen, Judge.

R. E. Collins was convicted of manslaughter in the first degree, and sentenced to imprisonment in the state penitentiary for seven years, and he appeals. Modified and affirmed.

W. W. Pryor and W. N. Stokes, for plaintiff in error.

The Attorney General and E. L. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J. R. E. Collins, plaintiff in error, in this opinion referred to as the defendant, was by information filed January 5, 1918, in the district court of Seminole county, charged with the crime of murder. In the charging part of the information it was stated that the defendant—

"unlawfully, willfully, intentionally, maliciously, and feloniously, without authority of law, without justification or excusable cause, and with a premeditated design then and there

existing in his mind to effect the death of one George Jackson, did assault, strike, and beat the said George Jackson upon the head with a certain cane (wooden) then and there held in his hand, thereby inflicting upon the head of the said George Jackson a mortal wound, from the effects of which * * * he died."

To this information a demurrer was filed stating that the facts alleged were not sufficient to constitute an offense. The record does not disclose that this demurrer was either sustained or overruled. Thereafter, however, the defendant announced ready for trial, and the trial proceeded, resulting in a verdict on September 20, 1919, for first-degree manslaughter, in which the defendant's punishment was fixed at imprisonment for seven years in the state penitentiary. After the overruling of a motion for a new trial, judgment on the verdict was rendered November 4, 1919, from which judgment defendant appeals to this court.

A synopsis of the facts, gathered from the testimony as a whole, may be stated as follows:

Defendant, Collins, was a former professional baseball player, but for a number of years had been badly crippled, having one stiff, shrunken leg, and habitually using a cane to assist him in walking. About two years prior to the homicide Collins, who was naturally very much interested in the sport of baseball, was instrumental in organizing a team and promoting ball games in the town of Wewoka. After several games had been played subscriptions and donations were solicited from persons interested, for the purpose of improving and inclosing the baseball park. These subscriptions and donations were not sufficient for that purpose, and to provide for the deficiency a note in the amount of $300 was executed, signed by 20 individuals. With the money so donated and borrowed lumber and wire netting were purchased and a

grand stand was erected, the baseball park inclosed or partially inclosed, and otherwise improved.

The organization, if indeed it could be called such, was loose and indefinite, consisting of persons who in one way or another contributed to the baseball enterprise. At the suggestion of the defendant, George Jackson, the deceased, was selected as president or manager and had charge of the business and finances of the organization before turning them over to the treasurer, W. L. Thurston, who was also nominated for his position by the defendant. After the construction of these improvements most of the young men of the community enlisted or were drafted for military service, and for that reason no games had been played in the park for some time. Shortly prior to the homicide the deceased, George Jackson, so far as appears from this record, without consulting others interested in the ball park, wrecked the grand stand, tore down the fence and other improvements there, and carried the lumber and other material out to his farm near Wewoka.

On the day of the difficulty defendant went into the pool hall and cold drink stand in Wewoka, and was at the counter drinking coca-cola, where he invited others to drink with him, among them being the deceased, Jackson. Deceased declined to drink, and then defendant asked him what he did with the lumber from around the ball park. Mr. Jackson replied that he had taken it out to his farm. Defendant asked him what his purpose was, and Jackson said it was to get the money he had tied up in it. Then a heated argument followed, in which some harsh things were said. The deceased accused the defendant of being drunk, and it is claimed that he called defendant a "crippled s—— of a b——." A few minutes later the quarrel was renewed in a drug store across the street, where the defendant had followed the deceased. After more words the defendant advanced on the deceased and struck him on the head with his cane, causing the de-

ceased to sink to the floor. The blow made an abrasion on the head of the deceased, from which he bled profusely. The deceased quickly revived from effects of the blow, and by- 'standers separated the two men, while both were in a fighting attitude.

Later that evening the deceased grew violently ill, and died the following day. A! post mortem examination of the cranium disclosed a fractured skull and large clots of blood at the base of the brain.

The evidence indicates that the left leg of the defendant was stiff, partially paralyzed and shrunken, and that defendant carried this cane habitually, being unable to walk without it. The cane was in evidence before the jury, but there was no definite testimony as to the kind of cane, except that it was a cane with a crook for a handle, presumably sturdy enough to be used as a staff.

There was evidence to support one of the theories of the state, that the defendant renewed the difficulty and struck the fatal blow in the heat of passion, in a cruel and unusual manner, and that the cane in question was capable of being used and was used as a deadly weapon.

Among numerous assignments of error urged in defendant's brief are instructions given by the court to which exceptions were taken, and the refusing to give instructions offered by the defendant. One of the instructions complained of is as follows:

"Murder is the unlawful killing of a human being with a premeditated design to effect the death of the person slain.

"Manslaughter in the first degree is the unlawful killing of a human being without a premeditated design to effect the death of the party slain, while engaged in the commission of a misdemeanor, or in the heat of passion, in a cruel and unusual manner by means of a dangerous weapon."

"The instruction above quoted defining manslaughter in the first degree was probably given from memory, in an attempt to follow the statute defining that offense (subdivision 2 of section 2320, R. L. 1910), which is as follows:

"Second. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

The insertion of the word "premeditated" and the omission of the word "but" makes this instruction more favorable to the defendant than if given in the exact language of the statute, and it was therefore not prejudicial.

The following instruction was given by the court and excepted to by the defendant:

"An unlawful killing may also be reduced from murder to manslaughter by misadventure or accident, and in this connection you are instructed that, if you believe or have a reasonable doubt thereof that the cane in question could or could not be a deadly weapon, and that the defendant used said cane without a premeditated design and intent to kill, and that death resulted from the blow inflicted by said cane, under such condition the unlawful killing, if you find same is unlawful, would be manslaughter in the first degree, and not murder."

The following instruction was also given by the court and excepted to by the defendant:

"You are further instructed that homicide is excusable in the following cases: When committed by accident and misfortune, in the heat of passion, upon sudden and sufficient provocation, or upon any sudden combat, provided that no dangerous weapon is used and the killing is not done in a cruel and unusual manner; and in this connection you are instructed that, if the homicide was committed by the defendant by accident and misfortune in the heat of passion, upon any sudden or sufficient provocation, or upon a sudden com-

bat, and that the killing was not done in a cruel and unusual manner and not with a dangerous weapon, the homicide would be excusable, and you should find the defendant not guilty.''

The last two instructions quoted are, to some extent, inconsistent with each other. Under the testimony here there was no occasion for giving an instruction on excusable homicide. The testimony for the state and for the defendant both show that the defendant, after the first difficulty, followed the deceased into another store and renewed the quarrel and deliberately struck him with his cane. The blow struck was not accidental; on the contrary, the testimony indicates that it was struck purposely, in the heat of passion, although probably without any intent to cause death, under the circumstances reducing the offense to manslaughter, as defined in another instruction. We therefore hold that the instruction to the effect that the killing, if by accident or misadventure, was manslaughter, is incorrect, but under the circumstances here did not operate to the defendant's prejudice.

The defendant further urges that the court erred in refusing to instruct the jury that a dangerous weapon is one with which death can be easily and readily produced, and that the cane used by the defendant is not in law a dangerous weapon; that it was incumbent upon the state to show that this cane was in fact a dangerous weapon and an instrument from the use of which death would probably result. We think the requested instruction was confusing and was not a correct statement of the law as applied to the facts in this case. While no description of the cane in question appears in the record, it does appear that the cane was produced and exhibited in the court, in the presence of the jury, and that demonstrative evidence was had and heard showing how and in what manner the cane was used at the time the fatal blow was struck.

It was held by this court in an early case, Johnson v. State, 1 Okla. Cr. 321, 97 Pac. 1059, 18 Ann. Cas. 300, that in an indictment charging that a murder was committed with a piece of two-inch plank and an ax handle, without setting out the weight or size of the instruments or that they were deadly weapons, the averments were sufficient. Under such circumstances the question of whether any instrument is a deadly weapon is a question of fact for the jury, and not a question of law for the court. Krchnavy v. State, 43 Neb. 337, 61 N. W. 628; People v. Valliere, 123 Cal. 576, 56 Pac. 433; Crow v. State, 55 Tex. Cr. R. 200, 116 S. W. 52, 21 L. R. A. (N. S.) 497, notes and annotations under "Clubs, Sticks, and Pieces of Wood."

Axes, hammers, whips, brickbats, canes, clubs, or sticks of wood, as a matter of law, are not ordinarily deadly weapons, but they may as a matter of fact become weapons of a very deadly character. Notes to Crow v. State, supra; Allen v. U. S., 157 U. S. 675, 15 Sup. Ct. 720, 39 L. Ed. 854; 2 Words and Phrases, 1853; 1 Words and Phrases, Second Series, 1203.

Many and various definitions of the term "dangerous weapon" may be found in the law books, but, like many other simple terms, we find no definition susceptible of general application that explains or elucidates the meaning of the term any better than the use of the words without explanation. We think, therefore, that in this case the court committed no error in refusing to instruct the jury defining "dangerous weapon" in the language requested, or in any other language. The term itself is self-explanatory as applied to the facts here, and whether or not the cane was intentionally used as a deadly weapon was properly a question for the jury.

The instruction given by the court on self-defense denied defendant's right to self-defense, if the jury found that defendant voluntarily and unnecessarily renewed the quarrel, and commented on the evidence. The evidence shows no facts or circumstances indicating that the defendant acted in self-defense. Portions of the defendant's own testimony refute this theory. From his testimony it appears that after the difficulty in the pool hall and after the deceased had called the defendant a vile name the deceased went into a drug store, and the defendant followed him in for the purpose, so he states, of making the deceased apologize for what he had said; that the deceased then said, "You are drunk, and when you get sober I will talk to you;" that the deceased stood there a little while, and then said, "You heard what I called you, and you cannot help yourself." When this remark was made the defendant struck the deceased with the cane. Based on this and other testimony, the court might, without error, have wholly omitted an instruction on self-defense, so that the court's qualification of the defendant's right of self-defense was not prejudicial.

It is urged that the court erred in refusing to instruct the jury on the law of manslaughter in the second degree. It has been held by this court in a number of cases that such an instruction is not necessary where, as in this case, it appears from the testimony that the issue of manslaughter in the second degree is not raised by the evidence. Instructions should be germane to the evidence introduced. Newby v. State, 17 Okla. Cr. 219, 188 Pac. 124; Updike v. State, 9 Okla. Cr. 124, 130 Pac. 1107; Hopkins v. State, 4 Okla. Cr. 194, 108 Pac. 420, 111 Pac. 947; Fooshee v. State, 3 Okla. Cr. 666, 108 Pac. 554.

One of the grounds urged by defendant in his motion for a new trial was that the instructions given by the court were

not signed by the court. The record indicates that the instructions were signed. At any rate, no objections were made or exceptions taken, and, if it were a fact that the instructions were not signed, such fact did not operate to prejudice the rights of the defendant.

It is further urged in the motion for a new trial that two of the jurors had been heard to express an opinion tending to show that they had heard about the tragedy and entertained hostile feelings towards the defendant. These were indefinite remarks, made about a year prior to the trial of this cause, in a political argument with third persons, and we think that the showing made in this regard was insufficient to impeach the qualifications of these jurors.

Considering the record as a whole, the defendant appears to have had a fair trial. The testimony amply justified the jury in finding the defendant guilty of manslaughter in the first degree. In view of the fact, however, that there were some acts of provocation on the part of the deceased bringing on the difficulty, and the fact that the defendant possibly did not anticipate the fatal consequences of the blow, and giving the defendant the benefit of the minor irregularities mentioned above, we feel that it would be proper and that this court will be justified in modifying the penalty imposed by the judgment of the trial court to a term of four years, and it is accordingly so modified.

The judgment as modified is affirmed.

DOYLE, P. J., and MATSON, J., concur.